IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL WILSON | ) | CASE NO: |
| 17027 Stone Church Road | ) | |
| Laurel, Indiana, 47024 | ) | JUDGE: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **COMPLAINT FOR VIOLATIONS OF** |
| APC WORKFORCE SOLUTIONS II, LLC | ) | **THE FAIR LABOR STANDARDS** |
| c/o Stat. Agent, Corporate Creations Inc. | ) | **ACT AND THE OHIO MINIMUM** |
| 119 E. Court Street | ) | **FAIR WAGE ACT** |
| Cincinnati, Ohio, 45202 | ) | |
| | ) | |
| -and- | ) | |
| | ) | (Jury Demand Endorsed) |
| BURNS & MCDONNELL | ) | |
| ENGINEERING COMPANY, INC. | ) | |
| c/o Stat. Agent, Incorp Services, Inc. | ) | |
| 9435 Waterstone Blvd, Ste 140 | ) | |
| Cincinnati, Ohio, 45249 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| MICHAEL RAYE | ) | |
| 191 Chapman Road | ) | |
| Newburgh, Maine 04444 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| JOSHUA HEATLEY | ) | |
| 1165 N 13th St #2, | ) | |
| Reading, Pennsylvania, 19604 | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Daniel Wilson, by and through undersigned counsel, as his Complaint against

Defendants, states and avers the following:

**PARTIES.**

1.  Wilson is an individual residing in Franklin County, Indiana.

2.    APC Workforce Solutions II, LLC. ("APC") is a Florida limited liability corporation with its principal place of business located in Orlando, Florida.

3.    At all times referenced herein, APC did business as "Workforce Logiq" and maintained an office located within this District at 471 Morrison Rd, Gahanna, OH 43230.

4.    During all times material to this Complaint, APC was Wilson's "employer" within the meaning of Section 3(d) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(d); Section 34a, Article II, Ohio Constitution, and Ohio R.C. § 4112.01(A)(2).

5.    Burns & McDonnell Engineering Company, Inc. ("Burns & McDonnell") is a Missouri corporation with its principal place of business located in Kansas City, Missouri.

6.    At all times referenced herein, Burns & McDonnell maintained an office located within this District at 530 W. Spring St., Suite 200, Columbus, OH 43215.

7.    During all times material to this Complaint, Burns & McDonnell was Wilson's "employer" within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d); Section 34a, Article II, Ohio Constitution, and Ohio R.C. § 4112.01(A)(2).

8.    Raye supervised and/or controlled Wilson's employment with APC and Burns & McDonnell; controlled the day to day operations of the APC and Burns & McDonnell at the worksite they operated jointly in Springfield, Ohio, to include the compensation policies and practices of that worksite; acted directly or indirectly in the interest of APC and Burns & McDonnell in relation to their employees at the Springfield, Ohio worksite; was empowered to take tangible employment actions against Wilson; and was an employer within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d); Section 34a, Article II, Ohio Constitution, and Ohio R.C. § 4112.01(A)(2).

9.    Heatley supervised and/or controlled Wilson's employment with APC and Burns & McDonnell; controlled the day to day operations of the APC and Burns & McDonnell at the

worksite they operated jointly in Springfield, Ohio, to include the compensation policies and practices of that worksite; acted directly or indirectly in the interest of APC and Burns & McDonnell in relation to their employees at the Springfield, Ohio worksite; was empowered to take tangible employment actions against Wilson; and was an employer within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d); Section 34a, Article II, Ohio Constitution, and Ohio R.C. § 4112.01(A)(2).

## PERSONAL JURISDICTION.

10. Defendants hire citizens of the state of Ohio, contract with companies in Ohio, and own or rent property in Ohio. As such, the exercise of personal jurisdiction over Defendants comports with due process.

## SUBJECT MATTER JURISDICTION AND VENUE.

11. This Court has jurisdiction over the subject matter of this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

12. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Wilson's state law claims because those claims derive from a common nucleus of operative facts.

13. Venue is proper in this District because Defendants do a sizeable portion of their business in this District, and all of the wrongs herein alleged occurred in this District.

## COVERAGE.

14. APC operates and controls an enterprise and employs employees engaged in interstate commerce or in the production of goods for commerce, or has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person.

15. At all times relevant to this Complaint, APC comprised an enterprise "engaged in commerce" as defined in 29 U.S.C. § 203(s)(1)(A)(ii), because they had gross operating revenues in excess of $500,000.00.

16. Burns & McDonnell operates and controls an enterprise and employs employees engaged in interstate commerce or in the production of goods for commerce, or has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person.

17. At all times relevant to this Complaint, Burns & McDonnell comprised an enterprise "engaged in commerce" as defined in 29 U.S.C. § 203(s)(1)(A)(ii), because they had gross operating revenues in excess of $500,000.00.

**<u>FACTS.</u>**

18. APC is a staffing agency that claims to "help[] clients achieve greater management, performance, and financial control over their workforce and talent supply chains."

19. At all times referenced herein, Burns & McDonnell worked with APC to provide it with employees to work at a remote construction site located in Springfield, Ohio ("Springfield Site").

20. Wilson is a former employee of APC and Burns & McDonnell.

21. Wilson began his employment with APC and Burns & McDonnell in or around February of 2017.

22. At all times referenced herein, APC and Burns & McDonnell jointly employed Wilson.

23. APC and Burns & McDonnell jointly devised, maintained, and promogulated the compensation policies for the Springfield Site that Wilson was subjected to.

24. Raye and Heatley enforced the compensation policies of APC and Burns & McDonnell.

25. Both APC and Burns & McDonnell retained the power fire Wilson.

4

26. Both APC and Burns & McDonnell supervised and controlled Wilson's work schedule and conditions of employment.

27. Both APC and Burns & McDonnell maintained employment records for Wilson.

28. Wilson would report his hours to Burns & McDonnell and would be paid by APC.

29. At all times referenced herein, Wilson was employed by Defendants as a Site Coordinator at the Springfield Site.

30. As a Site Coordinator, Wilson was responsible for quality assurance and project support.

31. At all times referenced herein, Wilson was paid on an hourly basis.

32. Wilson was non-exempt from the overtime requirements of the FLSA and the Ohio Minimum Fair Wage Standards Act ("OMFWSA").

33. At all times referenced herein, Wilson regularly worked five days a week, and often worked six days per week.

34. Wilson was typically scheduled to work ten (10) hours for each day he worked.

35. At all times referenced herein, Wilson regularly worked in excess of forty (40) hours per week, entitling him to overtime premium payments.

36. At all times referenced herein, Wilson was prohibited by Defendants from reporting more than fifty (50) hours on his timecards when he worked five days in a single week, regardless of how many hours he actually worked.

37. Wilson regularly worked in excess of fifty (50) hours when he worked five days a week.

38. At all times referenced herein, Wilson was prohibited by Defendants from reporting more than sixty (60) hours on his timecards when he worked six days in a single week.

39. Wilson regularly worked in excess of sixty (60) hours when he worked six days a week.

40. At all times referenced herein, Wilson routinely received multiple lengthy phone calls from Defendants related to his work, both before and after his ten-hour shift, and during weekends.

41.   The phone calls Wilson received would range from 10 minutes in length to an hour or more.

42.   On at least one occasion, Wilson received over 100 phone calls from his supervisors and co-workers on a day he was supposed to be off from work.

43.   In addition to fielding multiple phone calls, Wilson received numerous emails that he was responsible for responding to in a timely manner before and after his shift, and during weekends.

44.   On several occasions, Wilson was told that he could not include the time he spent taking phone calls or responding to emails on his timecard.

45.   Dan Hartzell, Wilson's supervisor in 2017, told Wilson he could "make the time up later" and told Wilson he could not report and/or "bill" more than ten (10) hours in a single day when Wilson asked about including his time on the phone and responding to emails on his time cards.

46.   Hartzell left the employment of Defendants in or around 2018.

47.   Subsequently, Wilson was supervised by Raye.

48.   Wilson sought clarification from Raye regarding reporting his time conducting phone calls and responding to emails.

49.   Like Hartzell, Raye told Wilson that he could not report more than fifty (50) hours on five-day workweeks or more than sixty (60) hours on six-day workweeks.

50.   Raye told Wilson that he got also phone calls and emails "at all hours of the day but that's the job."

51.   Based on his supervisors' instructions, Wilson only reported his hours of work up to fifty (50) hours or sixty (60) hours, depending on how many days he worked that week.

52.   As result of Defendants practices and or policies, Wilson routinely underreported his actual hours to conform with the "ten hours per day" rule.

53. Based on Defendants restrictions on reporting more than a set number of hours per week, Wilson estimates that he was denied approximately five (5) to twelve (12) hours of overtime during most weeks of his employment.

54. At all times referenced herein, Wilson was paid a weekly per diem in addition to his hourly pay.

55. During Wilson's first year of employment, he was paid a flat-rate per diem of $630.00 weekly, which was calculated by Defendants at $90.00 per day for seven days per week.

56. Wilson's per diem was in reality part of his compensation and did not approximate a true per diem calculated on Wilson's actual expenses in working for Defendants.

57. To the extent that Wilson's per diem was calculated on a seven-day basis, Wilson was paid a per diem for days he did not even work.

58. Defendants treated Wilson's $630.00 per diem as non-taxable.

59. In or around 2018, Defendants increased Wilson's per diem to $966.00 per week, characterizing it as a "raise."

60. At the time Wilson received the per diem "raise," he was told that was calculated as $138.00 per day for seven days per week.

61. To the extent that Wilson's per diem was calculated on a seven-day basis, Wilson was paid a per diem for days he did not even work.

62. Wilson's weekly $966.00 per diem was in reality part of his compensation and did not approximate a true per diem calculated on Wilson's actual expenses in working for Defendants.

63. Defendants treated Wilson's per diem as taxable and indicated as much on his paystubs because it exceeded the allowable federal per diem rate.

64. Defendants included Wilson's per diem payments as part of his wages on his W2.

65. Wilson was required to pay taxes on his per diem income in 2018 and 2019.

66. To the extent all or part of Wilson's per diem payments were compensation, and not a true per diem, all such compensation should have been included as part of the regular rate paid to Wilson. *See* 29 C.F.R. § 778.216(a), (b)(3), (c).

67. At all times referenced herein, Defendants failed to include any part of Wilson's per diem payments in the calculation of the overtime rate paid to Wilson.

68. At all times referenced herein, Wilson suffered from heart disease.

69. Wilson's heart disease substantially limits his cardiovascular and circulatory functions.

70. As a result of Wilson's heart disease, he is and was disabled within the meaning of Ohio R.C. § 4112.01(A)(13).

71. Wilson told Raye and Heatley about his heart disease.

72. Raye and Heatley were aware of Wilson's heart disease.

73. At all times referenced herein, Wilson lived in Laurel, Indiana, which is approximately 100 miles away from the Springfield Site.

74. As a matter of practice, Wilson would stay in a hotel in or around Springfield during the week.

75. In or around March of 2020, some of the first cases of novel coronavirus ("Covid 19") community spread were reported in Ohio.

76. Subsequently, Wilson's physician informed him that his heart disease made him vulnerable to Covid 19 and that he should avoid staying in hotels.

77. Wilson made Raye and Heatley aware of his physician's concerns and requested to be permitted to work from home for a period of time ("First Accommodation Request").

78. Defendants granted Wilson's First Accommodation Request.

79. Wilson worked from home for approximately three weeks during April of 2020.

80. Allowing Wilson to work from home did not impose an undue hardship on Defendants.

8

81. Wilson performed his job duties successfully from home.

82. Subsequently, Wilson resumed working at the Springfield Site, but he did not stay in Springfield.

83. Due to his physician's advice regarding Covid 19, Wilson avoided staying in hotels and would drive to the Springfield Site from his home in Indiana.

84. On or about May 7, 2020, Raye confronted Wilson and told him that he was no longer permitted to drive to work from home or to park his vehicle at the Springfield Site.

85. Wilson responded to Raye by remind Raye that Wilson's physician had advised him not to stay at hotels.

86. Wilson asked Raye to allow him to continue travelling home at night because of his heart disease and Covid 19 vulnerability ("Second Accommodation Request").

87. Allowing Wilson to stay at his home when he was off from work did not impose any burden on Defendants, much less an undue burden.

88. Despite driving to and from his home, Wilson was reporting to work each day on time.

89. Raye responded to Wilson by telling Wilson that he didn't "give a shit" about Wilson's vulnerability to Covid 19.

90. Defendants denied Wilson's Second Accommodation Request.

91. In denying Wilson's Second Accommodation Request, Defendants failed to engage in the interactive process with Wilson to identify other accommodations that could be provided to Wilson.

92. Forced to choose between his health (and possibly his life) or his job, Wilson submit a resignation notice to Defendants on or about May 9, 2020 ("Resignation Notice").

93. Wilson's Resignation Notice provided two weeks' notice and stated that Wilson's last day would be May 22, 2020.

94. Wilson provided Defendants with two weeks' notice because he believed it was the proper thing to do.

95. Wilson provided Defendants with two weeks' notice so he would have time to get a letter from his physician to provide to Defendants in hopes that they would relent on their refusal to grant his Second Accommodation Request and that Wilson could rescind his resignation.

96. On or about May 15, 2020, Wilson obtained a letter from his physician stating "I have been asked to provide a letter for Daniel Wilson. Dan has heart disease and it is not recommended for him to stay in hotels during the [sic] Covid 19" ("Doctor's Note").

97. A true and accurate copy of Wilson's Doctor's Note is attached hereto as Exhibit "A."

98. On or about May 15, 2020, Wilson presented his Doctor's Note to Raye and told him that he would "rather not resign."

99. Raye looked at Wilson's Doctor's Note; shook his head; and handed the Doctor's Note back to Wilson, stating "I don't want it."

100. A short while later, Raye and Heatley approached Wilson with a representative from APC on the phone (name unknown), who notified Wilson that he was being terminated "immediately."

101. Upon information and belief, Raye, Heatley, and the APC representative participated in the decision to terminate Wilson.

102. Defendants provided Wilson with no reason for his sudden termination.

103. Defendants terminated Wilson because of his disability.

104. As a result of Defendants' Conduct, Wilson has suffered and continues to suffer damages.

## **COUNT I: FAILURE TO PAY OVERTIME IN VIOLATION OF THE FLSA (29 U.S.C. § 207).**

105. Wilson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

10

106.    The FLSA requires each covered employer such as Defendants to compensate all non-exempt employees at a rate of not less than 1.5 times the regular rate of pay for all work performed in excess of 40 hours in a work week.

107.    Wilson was not exempt from the right to receive overtime pay under the FLSA.

108.    Wilson is entitled to be paid overtime compensation for all overtime hours worked.

109.    At all times relevant to this Complaint, Defendants had a policy and practice of failing and refusing to pay all overtime due to its employees.

110.    At all times relevant to this Complaint, Defendants failed to include all forms of compensation in the regular rate of pay for the purposes of calculating the proper overtime rate.

111.    Defendants either recklessly failed to investigate whether their failure to pay Wilson an overtime wage (of time and one-half of at least the applicable Ohio minimum wage) for all of the overtime hours worked during the relevant time period violated the Federal Wage Laws of the United States, they intentionally misled Wilson to believe that Defendants were not required to pay him for all overtime hours that he worked, and/or Defendants concocted a scheme pursuant to which they deprived Wilson of the overtime pay he earned.

112.    As a result of Defendants' failure to properly compensate Wilson at a rate not less than 1.5 times the regular rate of pay for all work performed in excess of 40 hours in a work week, Defendants violated the FLSA, 29 U.S.C. §§ 201 et. seq., including 29 U.S.C. § 207(a)(1) and § 215(a).

113.    Defendants' conduct as alleged herein constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

114.    Wilson is entitled to damages in the amount of his unpaid overtime compensation, plus liquidated damages as provided by the FLSA, 29 U.S.C. § 216(b), and other such legal and equitable relief as the Court deems just and proper, including his attorneys' fees and costs.

## COUNT II:  VIOLATION OF THE OHIO MINIMUM FAIR WAGE STANDARDS ACT, O.R.C. § 4111.01, *et seq.*

115. Wilson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

116. The OMFWSA requires that covered employees be compensated for every hour worked in a workweek including payment of all earned overtime compensation. *See* O.R.C. §§ 4111.01, *et seq*.

117. Defendants violated the OMFWSA with respect to Wilson by failing to pay Wilson overtime compensation for all hours he worked over forty (40) in a week.

118. Defendants violated the OMFWSA with respect to Wilson by failing to include all compensation paid to Wilson in the calculation of the proper overtime rate, thereby depriving Wilson of overtime pay to which he was entitled.

119. As a direct and proximate result of Defendants' unlawful conduct, Wilson has suffered and will continue to suffer a loss of income and other damages.

120. Having violated the OMFWSA, Defendants are liable to Wilson pursuant to O.R.C. § 4111.10 for the full amount of his unpaid overtime and for costs and reasonable attorneys' fees.

## COUNT III:  DISABILITY DISCRIMINATION IN VIOLATION OF OHIO R.C. § 4112.02, et seq – FAILURE TO ACCOMMODATE.

121. Wilson restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

122. At all times referenced herein, Wilson suffered from a disability as that term is defined by Ohio R.C. § 4112.01(A)(13).

123. Notwithstanding his disability, Wilson was capable of performing his essential job duties with accommodation.

124. In *Johnson v. Cleveland City School Dist.*, 2011-Ohio-2778, ¶ 60 (8th Dist. Cuyahoga), the Eighth District Court of Appeals explained that "[a] plaintiff who has established that he is disabled for R.C. 4112.02 purposes may further establish a discrimination claim by showing that the employer has declined to make a reasonable accommodation to known disabilities if such accommodation would not cause undue hardship on the employer."

125. By refusing Wilson's requests for reasonable accommodations for his disability and forcing Wilson to choose between risk his health and life in order to do his job, Defendants created working conditions for Wilson that were so intolerable that a reasonable person would have felt compelled to resign.

126. Notwithstanding Wilson's decision to resign, Wilson expressed a willingness to remain working for Defendants if they would grant him an accommodation for his disability that would allow him to perform his essential job functions.

127. Defendants refused to consider Wilson's request for a reasonable accommodation, and immediately terminated him when he presented his Doctor's Note to support his Second Accommodation request.

128. Defendants' conduct was in violation of R.C. § 4112.02(A).

129. As a direct and proximate cause of the Defendants' conduct, Wilson has suffered and will continue to suffer damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Daniel Wilson requests judgment against all Defendants and for an Order:

(a) Awarding Plaintiff unpaid minimum wages and overtime wages and an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b);

(b) Issuing a declaratory judgment that the practices complained of herein are unlawful under the FLSA, 29 U.S.C. §§ 201 et seq.;

(c)  Issuing a declaratory judgment that Defendant violated the recording-keeping requirements of the FLSA, 29 U.S.C. §§ 201 et. seq., including 29 U.S.C. § 211(c) and § 215(a), and the OMWFSA, R.C. § 4111.08;

(d)  Awarding Plaintiff compensatory and monetary damages against Defendants to compensate Plaintiff for lost wages, unpaid wages, and other consequential damages;

(e)  Awarding Plaintiff damages for the mental anguish and distress caused by Defendants' unlawful conduct;

(f)  Awarding against each Defendant punitive damages in an amount in excess of $25,000

(g)  Awarding pre-judgment and post-judgment interest as provided by law;

(h)  Awarding reasonable attorneys' fees and costs; and

(i)  Awarding such other and further relief that this Court deems appropriate.


Respectfully submitted,


/s/ Chris P. Wido
Chris P. Wido (0090441)
THE SPITZ LAW FIRM, LLC
25200 Chagrin Blvd., Suite 200
Beachwood, OH 44122
Phone: (216) 291-4744
Fax:    (216) 291-5744
Email: chris.wido@spitzlawfirm.com

Attorney for Plaintiff Daniel Wilson


## JURY DEMAND

Plaintiff Daniel Wilson demands a trial by jury by the maximum number of jurors permitted.


/s/ Chris P. Wido
Chris P. Wido (0090441)
THE SPITZ LAW FIRM, LLC